Ian McIntosh
CROWLEY FLECK PLLP
P.O. Box 10969
Bozeman, MT 59719-0969
Telephone:  (406)556-1430
imcintosh@crowleyfleck.com

Brad Banias (*Pro Hac Vice filed 07/17/24*)
Banias Law, LLC
602 Rutledge Avenue
Charleston, SC 29403
Telephone: (843)352-4272
brad@baniaslaw.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| NORTHERN ROCKIES REGIONAL CENTER, LLC, <br><br> Plaintiff, <br><br> v. <br><br> DIRECTOR, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, <br><br> Defendant. | Case No. 9:24-cv-00099-KLD <br><br> **PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................... ii

**EXHIBIT LIST** ...................................................................................v

**FACTS**...............................................................................................1

**ARGUMENT** ....................................................................................11

**I.　NRRC will succeed on the merits.**................................................12

　**A.　The NOIT violates the RIA.** .................................................12

　**B.　The NOIT violates the APA.**.................................................14

　**C.　The NOIT violates Due Process.** ...........................................18

**II.　　NRRC will close if it is terminated.**.............................................23

**III.　Equities favor an injunction.**......................................................24

**CONCLUSION**...................................................................................26

**CERTIFICATE OF COMPLIANCE** ...................................................27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Accardi v. Shaughnessy*, 347 U.S. 260 (1954)..........................................................12

*Air N. Am. v. Dep't of Transp.*, 937 F.2d 1427 (9th Cir. 1991) ...............................16

*Air North America v. Dept. of Transp.*, 937 F.2d 1427 (9th Cir. 1991) .................15

*Anchustegui v. Dept. of Agriculture*, 257 F.3d 1124 (9th Cir. 2001) ......................15

Atlantic Richfield Co. v. United States, 774 F.2d 1193 (D.C.Cir.1985).................16

Attorney General's Manual on the Administrative Procedure Act 91 (1947) ........16

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ............................................................18

*Blackwell College of Business v. Attorney General*, 454 F.2d 928
    (D.C.Cir.1971)....................................................................................................15

*Charlene Hagus, D.V.M. v. Michael Espy, Secretary, USDA*, 53 Agric. Dec. 443,
    1994 WL 733120 (U.S.D.A.) .............................................................................15

*Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 976 (C.D. Cal.
    2016) ...................................................................................................................23

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ...................................................................20

*Hsiao v. Stewart*, 527 F. Supp. 3d 1237 (D. Haw. 2021) .........................................11

*Jones v. Flowers*, 547 U.S. 220 (2006)....................................................................20

*Leslie Salt Co. v. United States*, 55 F.3d 1388 (9th Cir. 1995) ...............................13

*Loper Bright Enterprises v. Raimondo*, — U.S. —, 144 S. Ct. 2244(2024)...........13

*Lopez v. Davis*, 531 U.S. 230 (2001) .......................................................................13

*Matthews v. Eldridge*, 424 U.S. 319 (1976) ............................................................21

*Moore v. Madigan*, 789 F. Supp. 1479 (W.D.Mo.1992) .........................................15

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950).........................19

*New York Pathological & X–Ray Laboratories, Inc. v. Immigration and Naturalization Service*, 523 F.2d 79 (2d Cir.1975)..................................................15

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................11

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)..................................17

*Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011)...............................23

*Portman v. Cty. of Santa Clara*, 995 F.2d 898 (9th Cir. 1993) ...............................18

*United States Dep't of Agric., Food & Nutrition Serv.*, No. EDCV1802021CJCSPX, 2019 WL 13045128 (C.D. Cal. Jan. 9, 2019) ......23

*Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56 (9th Cir. 1994) ...............................................................................18

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ...........................................11

*Wright v. Beck*, 981 F.3d 719 (9th Cir. 2020)..............................................19

*Yi Tu v. Nat'l Transp. Safety Bd.*, 470 F.3d 941 (9th Cir. 2006) ...........................20

**Statutes**

5 U.S.C. § 551(8) ................................................................................ 14, 15

5 U.S.C. § 558(c) ........................................................................ 14, 15, 16, 17

5 U.S.C. § 559..................................................................................15

5 U.S.C. § 705...................................................................................11

5 U.S.C. § 706(2)(D)............................................................................12

8 C.F.R. § 204.6 ............................................................................ 1, 2, 19

8 U.S.C. § 1153(b)(5)........................................................................ passim

21 U.S.C.§ 123 (Cattle Contagious Diseases Act) .................................................15

EB-5 Reform and Integrity Act of 2022 ("the RIA"). P.L. 117-103, 136 Stat. 1070 (Marc. 15, 2022)............................................................ passim

INA 203(b)(5)(J)(iv)(II).........................................................................8

**Other Authorities**

Black's Law Dictionary (6th ed.1990) ......................................................................13

https://egov.uscis.gov/processing-times/historic-pt (last visited July 16, 2024).....25

https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-regional-centers/regional-center-terminations  (last visited July 16, 2024) .................................................................................................. 10, 24

USCIS Policy Manual, Vol. 6, Part G, Ch. 4(H)(3) ...............................................10

USCIS Policy Manual, Vol. 6, Part G, Ch. 8(A)(2) ........................................ 10, 24

**Rules**

88 Fed. Reg. 13141 ...................................................................................................5

88 Fed. Reg. 13142 ................................................................................................5, 13

88 Fed. Reg. 13143 ...................................................................................................6

# EXHIBIT LIST

Exhibit A    Declaration of Matthew Kidd

Exhibit B    Designation Amendment Approval

Exhibit C    Notice of Intent to Terminate

On July 31, 2024, Defendant U.S. Citizenship and Immigration Services ("USCIS") will put Plaintiff Northern Rockies Regional Center, LLC ("NRRC") out of business by terminating its license to operate. The fallout will be extreme: it will put at risk $488 million in direct foreign investment into Montana, $1.7 billion in ongoing development projects in Montana, and thousands of full-time jobs for Montanans. Despite these dire consequences, USCIS did not give the NRRC timely, actual notice of noncompliance, and it did not give the NRRC an opportunity to remedy the noncompliance before termination.  Such termination is therefore unlawful. A temporary restraining order or preliminary injunction is necessary to enjoin the termination without actual notice and an opportunity to remedy any noncompliance to prevent irreparable harm to the NRRC and Montana.

## FACTS

In the early 1990s, Congress enacted a job creation immigrant visa. 8 U.S.C. § 1153(b)(5) ("EB-5"). To qualify for lawful permanent residence through the EB-5 program —colloquially called a "green card"—a noncitizen could invest $1,000,000 into a United States business and create 10 direct, full-time jobs. *See generally* 8 C.F.R. § 204.6. The goal of the EB-5 program is simple: incentivize direct foreign investment into job creating entities with the promise of a green card.

*Brief in Support of Motion for TRO - 1*

Building on this framework, Congress also created a license for EB-5 "regional centers" to incentivize pooled investments—read: larger investments—on more flexible terms. *See* 8 C.F.R. § 204.6(m). To become a "designated" regional center, a U.S. company applies to USCIS and proposes to seek foreign investment for a certain geographic area for certain industries. *Id.* If approved, noncitizens who invest in U.S. businesses associated with a "designated" regional center need only demonstrate 10 direct *or* indirect, full-time jobs using reliable econometric analyses. *Id.* The ability to qualify with *indirect* job creation permitted noncitizens to invest in large-scale real estate development, which would eventually dominate the EB-5 program.

In 2011, the NRRC sought "designation" as a regional center to seek direct foreign investment for the state of Montana—and only the state of Montana—in the industry of commercial and residential development. Declaration of Matt Kidd ("Kidd Dec.") at ¶ 3 (attached as Exhibit A). USCIS granted the NRRC's license on April 11, 2011. *Id.*    Since receiving its designation, the NRRC has completed two major projects and is currently seeking investment in three major projects:

- **Yellowstone Club Village - Completed 2019**: The Yellowstone Club Village Core Project was the construction of 48 condominium units, three restaurants, retail space, and other amenities.  New amenities built as part of the Project included ski lockers, a luxury spa, gym, and an indoor and

outdoor pool area. The Project produced over 100 direct and indirect jobs for each of its EB5 Investors.

- **Montage Big Sky: Rural EB-5 – Completed 2022**: The Montage Big Sky Project was the construction of a five-star luxury hotel and residential real estate within the Spanish Peaks Resort.  Completed in early 2022, the Montage has 99 luxury hotel guestrooms, approximately 80,000 square feet of meeting and amenity space (including restaurants, bars, spa and fitness areas, a bowling alley, skier services, and family recreation area), and 39 private condominium residences. Each EB-5 investors created more than 10 direct and indirect jobs.

- **One & Only Hotel At Moonlight Basin: Rural EB-5 – Active** The Project will include construction of a luxury hotel, guest cabins, for-sale cabins, amenity spaces including a full-service spa facility, and other areas. The Project's hotel rooms will be spread across three lodge buildings and 19 guest cabins. The Project also includes 62 branded for-sale Private Homes and four branded homesite development lots. The Project is currently under construction and is expected to be completed in 2025.

- **Moonlight Basin West: Rural EB-5 – Active** Moonlight Basin West is a resort development across 970 acres at the Moonlight Basin Resort in Big Sky, Montana. The Project comprises 36 residential units and 46 custom

homes with direct golf and ski access to its owners.  A new 30,000 square foot clubhouse as well as 19 new golf holes will also be built. The Project is currently underway and is expected to be completed in 2026.

- **Yellowstone Club - Phase II: Rural EB-5 – Active** Big Springs Village Phase 2 is a 420,000 SF mixed-use alpine village situated at the base of Yellowstone Club, a private ski, golf, and outdoor recreational community in Big Sky, Montana. The Project will be anchored by 35 for-sale residential condominium units and will also include an array of amenities and support spaces. Construction commenced in late 2022 and is scheduled for completion in 2026.

*See* https://www.investusafund.com/ (click on "Our Projects") (last visited July 17, 2024). Since getting its designation, the NRRC is responsible for more than $488 million dollars in direct investment in Montana, creating more than 7,500 jobs for lawful workers in Montana. Kidd Dec. ¶ 8. Throughout this time, the NRRC consistently complied with the everchanging tapestry of EB-5 statutes, regulations, and policies. Then Congress amended the EB-5 statutes.

On March 15, 2022, the President signed the EB-5 Reform and Integrity Act of 2022 ("the RIA"). P.L. 117-103, 136 Stat. 1070 (Marc. 15, 2022) (codified at 8 U.S.C. § 1153(b)(5)). As part of the RIA, Congress established the "EB-5 Integrity Fund." 8 U.S.C. § 1153(b)(5)(J). The EB-5 Integrity Fund sought to raise money to

enforce the RIA's accountability and integrity measures. *Id.* at § 1153(b)(5)(J)(iii) (describing permissible use of the money in the EB-5 Integrity Fund).

Congress generated this revenue by requiring regional centers "designated under subparagraph (e)" to pay an annual fee of $10,000 or $20,000, depending on the number of investors in the regional center's projects. *Id.* at § 1153(b)(5)(J)(ii)(I) ("Integrity Fee"). To ensure payment, Congress further created a two-step enforcement process:

> **(iv) Failure to pay fee**
>
> The Secretary of Homeland Security shall—
>
> > (I) impose a reasonable penalty, which shall be deposited into the Fund, if any regional center does not pay the fee required under clause (ii) within 30 days after the date on which such fee is due; and
> >
> > (II) terminate the designation of any regional center that does not pay the fee required under clause (ii) within 90 days after the date on which such fee is due.

*Id.* at § 1153(b)(5)(J)(iv). Under this two-step enforcement process, Congress ensured a designated regional center would get actual notice of nonpayment and an opportunity to remedy nonpayment—with a reasonable penalty—*before termination*.

On March 2, 2023, USCIS published a "constructive notice" in the Federal Register to implement the Integrity Fee and its enforcement provisions. DHS, Notice of EB-5 Regional Center Integrity Fund Fee, 88 Fed. Reg. 13141, 13142

*Brief in Support of Motion for TRO - 5*

(first column) (DHS Mar. 2, 2023).  In its Constructive Notice, USCIS admitted that the Act "requires DHS to impose a reasonable penalty (to be paid to USCIS and deposited into the Fund when collected) on a regional center that does not pay the annual Integrity Fund Fee within 30 days after the date on which such fee is due." *Id.* at 13143 (third column). Because the fiscal year 2023 Integrity Fee would have been due between October 1 and 31, 2022, but USCIS only implemented the Integrity Fee in March of 2023, USCIS chose to forgo late penalties for fiscal year 2023 payments—thereby forgoing any notice of nonpayment—until it took further steps to define "reasonable penalty." *Id.*

Though USCIS would forgo late penalties and any actual notice of nonpayment, USCIS would still terminate any noncompliant regional center's designation after 90-days of nonpayment for any reason:

> USCIS will, as authorized by the 2022 Act, terminate the designation of any regional center that does not pay the full fee within 90 days after the date on which such fee is due (*i.e.*, a regional center does not make payment, or a regional center pays $10,000 when it owes $20,000).

*Id.* While the Constructive Notice claims termination would "not be automatic," USCIS announced a strict liability policy. *Id.*

USCIS explained that, while it would issue notices of intent to terminate, such notices would require the "regional center to prove that the fee was paid in the proper amount *by the due date* before sending a notice of termination." *Id.* (emphasis added). In other words, if a regional center made a good faith error in

*Brief in Support of Motion for TRO - 6*

the calculation or submission of the Integrity Fee, it would be terminated because it could not show it submitted the proper fee on or by December 31, 2023. Thus, under USCIS's constructive notice, a designated regional center who failed to timely pay the Integrity Fee would be terminated without actual notice or an opportunity to remedy any nonpayment.  The NRRC timely paid the fiscal year 2023 Integrity Fee on March 27, 2023. Kidd Dec. ¶ 12.

Around the same time, the NRRC entered negotiations to sell to Matt Kidd. *Id.* at ¶ 13. The RIA requires designated regional centers to apply to amend their designation before making any significant changes to their structure, ownership, or administration. 8 U.S.C. § 1153(b)(5)(E)(vi)(I). The NRRC, therefore, filed Form I-956, Application for Regional Center Designation to request an amendment to its designation or license on June 16, 2023. Kidd Dec. ¶ 15. As proposed to USCIS in its Form I-956, Mr. Kidd acquired the NRRC in October 2023. *Id.* at ¶ 17. During the acquisition, the seller represented that the NRRC had no indebtedness or liabilities—which would include any outstanding fees to USCIS due on or by October 16, 2023. *Id.* The acquisition closed, and the NRRC continued to solicit investors for its ongoing projects. *Id.* at ¶ 19.

USCIS approved the NRRC's change in ownership on May 3, 2024, when it approved the NRRC's request to amend its designation. Designation Amendment Approval (attached as Ex. B). In its approval, USCIS provided the NRRC notice

that it would need to pay the next Integrity Fee for fiscal year 2025 within thirty

days of October 1:

> Every year on October 1, each designated regional center with 20 or fewer total investors in the preceding fiscal year in its NCEs must pay $10,000 to the EB-5 Integrity Fund (the "Fund"). Designated regional centers with 21 or more petitioners in the preceding fiscal year must pay $20,000 to the Fund.

Ex. B at 3. USCIS also explained that it would engage in a two-step process to

remedy any nonpayment—sanction and then termination:

> USCIS will impose a reasonable penalty, which shall be deposited into the Fund, if the Regional Center does not pay the fee required within 30 days after the date on which such fee is due. USCIS may sanction, and ultimately terminate, any regional center that does not pay the fee required within 90 days after the date on which the fee is due.

*Id.* USCIS's May 3, 2024 approval never once claims that the NRRC was

noncompliant with any EB-5 statute, regulation, or policy. And it never claims that

the NRRC did not timely pay the fiscal year 2024 Integrity Fee. *Id.*

On June 27, 2024, however, USCIS issued the NRRC a "Notice of Intent to

Terminate" ("NOIT"). NOIT (attached as Ex. C). The NOIT terminates NRRC's

Designation as of July 30, 2024. *Id.* at 4. While styled a "notice," it does not

provide NRRC the ability to remedy the alleged noncompliance:

> As of the date of this notice, USCIS records indicate that the Regional Center did not pay the required EB-5 Integrity Fund fee for **Federal fiscal year 2024**. Due to the Regional Center's failure to pay the required EB-5 Integrity Fund fee within 90 days of it becoming due, USCIS intends to terminate the designation of the regional center for participation in the Program as required by INA 203(b)(5)(J)(iv)(II).

•        •        •

**The Regional Center must provide evidence that it submitted its required EB-5 Integrity Fund Fee payment within the applicable payment period. USCIS will reject EB-5 Integrity Fund fee payments for fiscal year 2023 and the fiscal year 2024 received after Dec. 30, 2023, including those made in response to this Notice of Intent to Terminate.**

*Id.* (emphasis in original). Because the NRRC did not pay the fiscal year 2024 Integrity Fee on or by December 30, 2023, its designation will be terminated. Kidd Dec. ¶ 29.

This was the first *actual* notice the NRRC received of nonpayment. USCIS did not issue the NRRC a late-fee penalty notice. It did not issue a notice of intent termination before December 30, 2023, which would give the NRRC an opportunity to remedy the nonpayment. And it did not identify the noncompliance when it approved NRRC's amended designation. While it is styled a "notice," it is in fact a termination because the NRRC did not pay the fiscal year 2024 Integrity Fee on or by December 30, 2023, and therefore, it cannot show it paid the fee prior to December 30, 2024, and it cannot now pay the fee. Kidd Dec. ¶ 29. Thus, under the terms of the NOIT, USCIS will terminate the NRRC.[1]

---

[1] On July 16, 2024, CIS issued a Policy Alert entitled "EB-5 Regional Center Noncompliance and Sanctions." PA-2024-20, Policy Alert: EB-5 Regional Center Noncompliance and Sanctions (USCIS Jul. 16, 2024). The Policy Alert amends CIS's policy manual. *Id.* While the new additions to the Policy Manual claim CIS will exercise discretion when imposing a sanction, the Policy Manual continues to

This termination will irreparably harm the NRRC and Montana. First, terminating NRRC's designation close the NRRC. Kidd Dec. ¶ 36-43. Without its designation, pending immigration petitions that are based on NRRC sponsored projects will be denied because they will not be associated with a designated regional center. To the extent these investors are able to transition to a new regional center under 8 U.S.C. § 1153(b)(5)(m)(ii)(I)(aa), they will transition *away* from the NRRC, therefore, transferring away any financial benefit to the NRRC. Thus, even if the investors' pending applications can withstand the termination, the NRRC will not. Further, the NRRC—even if it takes immediate steps to file for a new designation—will not be able to continue to solicit investors for its ongoing projects. USCIS, Policy Manual, Vol. 6, Part G, Ch. 8(A)(2). Second, the termination will irreparably harm the NRRC's reputation, good will, and business prospects because USCIS publishes a list of terminated regional centers for public inspection[2] and notifies affected investors. USCIS, Policy Manual, Vol. 6, Part G, Ch. 8(A)(2). EB-5 investors are sophisticated customers, and even if the NRRC can file to get designated again, EB-5 investors will know about the termination

---

describe nonpayment of the Integrity Fee as a "violation requiring termination." USCIS, Policy Manual, Vol. 6, Part G, Ch. 4(H)(3) (available at https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-4 (last visited July 16, 2024)).

[2] https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-regional-centers/regional-center-terminations (last visited July 16, 2024).

*Brief in Support of Motion for TRO - 10*

and it will hurt NRRC's ability to solicit new investment. Kidd Dec. ¶¶ 40-41.

Finally, this termination will set off an unstoppable torrent of litigation between the

NRRC, its investors, the previous owners of the NRRC, USCIS, and the

underlying businesses, and the attorneys involved. Kidd Dec. ¶ 42. Such litigation

will shutter NRRC.

## ARGUMENT

USCIS's NOIT should be enjoined and set aside because it violates NRRC's

statutory and Constitutional procedural rights.  A temporary restraining order or

preliminary injunction is "an extraordinary remedy never awarded as of right."

*Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). The Administrative

Procedure Act expressly permits courts to enjoin agency actions that would cause

irreparable harm. 5 U.S.C. § 705. Courts apply the traditional factors for an

injunction to evaluate stays under § 705. *Hsiao v. Stewart*, 527 F. Supp. 3d 1237,

1248 (D. Haw. 2021).

A party seeking such an order must show: (1) a likelihood of success on the

merits; (2) a likelihood of irreparable harm in the absence of the injunction; (3) that

the balance of hardships tips in the movant's favor; and (4) that the public interest

is not disserved by the issuance of the injunction. *Id.* The first two factors are the

most important. *Nken v. Holder*, 556 U.S. 418, 434 (2009). But the third and fourth

factors typically "merge when the Government is the opposing party." *Id.* at 435.

## I.     NRRC will succeed on the merits.

The NRRC is likely to succeed on the merits because the NOIT violates the NRRC's procedural rights under the RIA, the APA, and the Constitution.

This Court has an obligation to set aside "agency action . . . found to be . . . not in accordance with law . . . contrary to constitutional right, privilege or immunity; [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Under *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), agencies must follow all procedures required by law, even for substantive decisions committed to discretion. *Id.*

### A.     The NOIT violates the RIA.

USCIS's NOIT was issued "without observance of procedure required by" the RIA and, therefore, NRRC is likely to succeed on the merits of the case.

The RIA mandates two steps be taken to terminate the designation of a regional center: (1) give actual notice of a reasonable penalty; and (2) terminate the designation: "[USCIS] shall . . . impose a reasonable penalty . . . and terminate the designation[.]" 8 U.S.C. § 1153(b)(5)(J)(iv).  The Act uses mandatory language to mandate that USCIS to give notice of a late-penalty before terminating: USCIS "*shall* . . . impose a reasonable penalty, which *shall* be deposited into the Fund, if any regional center does not pay the fee required under clause (ii) within 30 days

after the date on which such fee is due." *Id.* The term "shall" is imperative or mandatory and "in ordinary usage means 'must' and is inconsistent with a concept of discretion." Black's Law Dictionary (6th ed.1990); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995) (noting that "the word 'shall' standing by itself is a word of command rather than guidance"). "Shall" carries more weight when it is used to "impose discretionless obligations." *Lopez v. Davis*, 531 U.S. 230, 231 (2001).

Here, USCIS did not provide the NRRC notice of its intent to impose a reasonable penalty or impose a reasonable before it issued the NOIT. If it had, the NRRC would have had actual notice of the unpaid Integrity Fee and it would have remedied the lapse immediately, even with a reasonable penalty. Kidd Dec. ¶ 31. In its March 3, 2023 notice, USCIS claimed it had discretion to forgo the first step of the termination process under § 1153(b)(5)(J)(iv) until it further defined "reasonable penalty," 88 Fed. Reg. at 13142, but Congress's mandate that USCIS "shall" impose a reasonable penalty deprives USCIS of the discretion to forgo that step. The NRRC does not challenge USCIS's discretion to interpret the statutory term "reasonable penalty"—nothing would prevent it from interpreting reasonable penalties for fiscal year 2024 to be $0 dollars—but USCIS does not have discretion to forgo the step completely because Congress did not delegate it such discretion. *See Loper Bright Enterprises v. Raimondo*, — U.S. —, 144 S. Ct. 2244, 2263 (2024). By failing to

issue a notice of sanction or impose a reasonable penalty, it deprived NRRC of *actual notice* of the unpaid Integrity Fee which is required under § 1153(b)(5)(J)(iv).

As such, the NRRC is likely to succeed on its argument that USCIS's NOIT is in violation of NRRC's procedural rights under the RIA.

## B.   The NOIT violates the APA.

To the extent this Court interprets the RIA to permit USCIS to forgo noticing or imposing a late penalty under § 1153(b)(5)(J)(iv), USCIS's NOIT violates 5 U.S.C. § 558(c) because it does not give the NRRC the ability to "achieve compliance" before termination.

The APA requires all agencies to give regulated parties the ability to achieve compliance with lawful requirements prior to termination of a license. 5 U.S.C. § 558(c). The APA states that a "'license' includes the whole or a part of an agency permit, certificate, *approval*, registration, charter, membership, *statutory exemption* or *other form of permission*." 5 U.S.C. § 551(8) (emphasis added). And under § 558(c), an agency that seeks to terminate a license must give the regulated party notice and the opportunity to achieve compliance before termination:

> [T]he withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given—
>
> > (1) notice by the agency in writing of the facts or conduct which may warrant the action; and

(2) opportunity to demonstrate or achieve compliance with all lawful requirements.

5 U.S.C. § 558(c). Further, a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so expressly." 5 U.S.C. § 559.

Here, the NOIT is unlawful under § 558(c). First, the NRRC's "designation" as a regional center is a "license." "The definition of license in the APA is extremely broad." *Air North America v. Dept. of Transp.*, 937 F.2d 1427, 1436–38 (9th Cir. 1991). Courts have held that various approvals constitute license under § 551(8), such as a permit to graze on national forest land, *Anchustegui v. Dept. of Agriculture*, 257 F.3d 1124 (9th Cir. 2001); to "specifically approved stockyard" status under the Cattle Contagious Diseases Act, *Moore v. Madigan*, 789 F. Supp. 1479 (W.D.Mo.1992); to veterinarian accreditation, *Charlene Hagus, D.V.M. v. Michael Espy, Secretary, USDA*, 53 Agric. Dec. 443, 1994 WL 733120 (U.S.D.A.); to designation by the legacy-Immigration and Naturalization Service of a facility as an approved laboratory for conducting medical examination, *New York Pathological & X–Ray Laboratories, Inc. v. Immigration and Naturalization Service*, 523 F.2d 79 (2d Cir.1975); and to approval granted to an institution of higher learning authorizing entry of nonimmigrant alien students for study, *Blackwell College of Business v. Attorney General*, 454 F.2d 928 (D.C.Cir.1971). A quick review of USCIS's May 3, 2024 Amendment to the NRRC's Designation as a Regional Center

*Brief in Support of Motion for TRO - 15*

reveals (1) it is an "approval"; (2) it grants NRRC various permissions to engage in the EB-5 program; and (3) it grants the NRRC exemptions from the default rules of the EB-5 that apply to applications that are not associated with regional centers (e.g., counting indirect jobs versus only direct jobs).  Ex. B at 2-4.

Second, USCIS did not give sufficient notice to NRRC or an opportunity for NRRC to achieve compliance prior to termination. "Congress enacted section [§ 558(c)] to afford licensees 'an opportunity to comply with the requirements' of a license before termination." *Air N. Am. v. Dep't of Transp.*, 937 F.2d 1427, 1438 (9th Cir. 1991) (quoting Atlantic Richfield Co. v. United States, 774 F.2d 1193, 1200 (D.C.Cir.1985) (quoting Attorney General's Manual on the Administrative Procedure Act 91 (1947)). In this Circuit, "notice is sufficient if the notice warns the licensee of the parameters of acceptable conduct and thereby prevents unfair surprise." *Air N. Am. v. Dep't of Transp.*, 937 F.2d 1427, 1438 (9th Cir. 1991). And whether notice is sufficient to prevent unfair surprise is a fact intense analysis:

> notification issued upon the adoption of a regulation will not in all cases be sufficient; a claim of unfair surprise may carry significant weight if no notice of a rule's requirements has been given for many years. In short, the sufficiency of notice is a fact-specific inquiry.

*Id.* (internal citations omitted). If the notice is sufficient, § 558(c) still "requires that a licensee be provided an opportunity to comply with the relevant rules, or an opportunity to demonstrate compliance." *Id.*

Here, the NOIT effected an unfair surprise on the NRRC because USCIS approved its amended designation less than 2 months prior to issuing the NOIT. Ex. B. The approval of the amendment gave NRRC no reason to doubt it was not in compliance with all of statutes, regulations, and policies controlling EB-5 regional centers. Ex. B at 1. The approval notice in fact explained that, if USCIS determined the NRRC did not pay the Integrity Fee, it would penalize them and then "may" terminate them. EX. B at 3 The NOIT, therefore, constituted unfair surprise to the NRRC that it was not in compliance with the RIA. Further, the Agency's constructive notice via the Federal Register is insufficient to be notice because it was not a full notice and comment rulemaking; it claims it is merely an interpretive rule, which are by definition not binding. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96, (2015). A random, non-binding filing in the Federal Register is not sufficient notice filed months before any claim of noncompliance is not sufficient notice to the NRRC that it was out of compliance. Independently, the NOIT does not give NRRC the opportunity to comply with the relevant rules and, therefore, is violative of § 558(c). The NOIT provides no opportunity to "achieve compliance." As such, the NOIT violates § 558(c).

As such, the NRRC is likely to succeed on its argument that USCIS's NOIT is in violation of NRRC's procedural rights under the APA.

### C.   The NOIT violates Due Process.

To the extent the NOIT does not violate the NRRC's statutory procedural rights, USCIS's NOIT was issued "contrary to a constitutional right" because the timing of the NOIT deprives the NRRC of a meaningful opportunity to respond.

As a threshold issue, the NRRC has a cognizable due process interest in its designation. A claim "based upon procedural due process thus has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). Moreover, a protected property interest exists when an individual has a "legitimate claim of entitlement" that derives from "existing rules or understandings." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). "A reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms." *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994).

Here, nothing in the RIA makes the regional center designation discretionary; rather, the RIA's relevant provisions are all drafted with mandatory language. 8 U.S.C. § 1153(b)(5)(E) (using the word shall 17 times). And even the termination provisions relied on in the NOIT are mandatory; they are not written in the fashion that USCIS "may" in its "discretion" terminate for nonpayment of the Integrity Fee.

*Brief in Support of Motion for TRO - 18*

8 U.S.C. § 1153(b)(5)(J)(iv). USCIS's own regulations further reinforce the mandatory nature of regional center designation by requiring a decision on an application for designation. 8 C.F.R. § 204.6(m)(5). The NRRC has a legitimate claim of entitlement to a nondiscretionary benefit—its regional center designation— that is created by statute and regulation. It therefore has a cognizable due process interest.

As a threshold issue, USCIS's NOIT is constitutionally deficient because it deprives NRRC of an opportunity to meaningfully respond. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Whether notice is sufficient is an assessment of the means of the notice. *Id.* at 315 (internal citations omitted). Since *Mullane*, the Court has "adhered unwaveringly to its pronouncements, frequently holding that inadequate attempts to provide notice violate due process." *Wright v. Beck*, 981 F.3d 719, 728 (9th Cir. 2020) (internal citations and quotation marks omitted). Applying *Mullane*, the Court has deemed unconstitutional "outright failures to even attempt to provide notice." *Id.* Notice is "critical because it enables the opportunity to be heard." *Id.* at 727. A

insufficient or untimely notice, therefore, deprives a licensee of a meaningful opportunity to respond, remedy, or object is constitutionally infirm. *Id.*

Untimely notice can render the notice unconstitutional. It is a long-standing due process requirement that the government provide any required notice in a timely manner. *See Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (holding that "timely and adequate notice" of the reasons underlying the deprivation of a right guaranteed by the Due Process Clause is a key requirement of due process). A notice must be timely-enough to provide a meaningful opportunity to respond. *See Yi Tu v. Nat'l Transp. Safety Bd.*, 470 F.3d 941, 945 (9th Cir. 2006). At a minimum, notice must be timely enough to defend against the charges before termination or loss of the due process interest. *See Jones v. Flowers*, 547 U.S. 220, 230 (2006).

Here, the NOIT is not a constitutionally adequate notice because it was issued too late for the NRRC to respond "meaningfully" by remedying the late payment. While styled as a NOIT, it is in fact a termination because, regardless of the NRRC's reason for untimely payment, the NOIT provides no opportunity to respond by remedying the untimely Integrity Fee payment. Ex. C. A timely *actual notice*—one issued to the NRRC a reasonable amount of time prior to the final termination date—would provide sufficient notice to the NRRC and give them the opportunity to either remedy the nonpayment or explain its rationale for nonpayment in a timely fashion. USCIS's process here is akin to providing no notice because no response can satisfy

*Brief in Support of Motion for TRO - 20*

USCIS's demands where the recipient did not pay the right amount by the December 30, 2023. The NOIT is unconstitutional as deficient notice and, therefore, it should be enjoined.

To the extent this Court holds the notice was adequate, the termination process violates due process under *Matthews v. Eldridge*, 424 U.S. 319 (1976).  Under *Matthews*, the Court should balance three factors:

> [T]he specific dictates of due process generally requires consideration of three distinct factors: [1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335

Under *Matthews*, the lack of timely pre-termination notice renders the process unconstitutional. NRRC's private interest affected here is substantial. The NRRC will go out of business without its designation. It is like taking a liquor license away from a liquor store; it cannot operate. Thus, NRRC's interest here is nothing short of its existence. NRRC's interests further extend to the harm that will befall the 500+ investors that rely on NRRC's designation, the $1.7 billion in ongoing development in Montana based on NRRC's designation, and the thousands of jobs that have been and will be created in Montana. This private interest cannot be overstated.

*Brief in Support of Motion for TRO - 21*

Second, the risk of erroneous deprivation of NRRC's designation is incredibly high under USCIS's current strict liability interpretation. Here, the fee went unpaid despite a sophisticated business transaction. But under USCIS's process, a regional center that sends the integrity fee timely, but gets lost in the mail, is subject to termination if it does not show up by December 30 of the relevant fiscal year. This punishes good faith regional centers for actions outside its control. In such a scenario, the probable value of a timely notice of late payment or nonpayment with sufficient time to respond and cure the nonpayment is incredibly high. It should be noted that this is not an additional step for USCIS to undertake. Rather, it is a matter of timing; it requires nothing more than the same NOIT to be issued a reasonable amount of time before December 30 of each fiscal year. Congress envisioned a two-step process for termination: step 1 would be notice and assessment of a late penalty; step 2 would be termination for those who receive such notice and refuse to pay the Integrity Fee. This fits the scheme Congress created and USCIS explained in its approval of NRRC's amendment.

Finally, the Government would benefit for these additional steps because good faith regional centers who intended to pay but failed to do so despite their good faith efforts or mistakes would pay into the Integrity Fund. It would increase the revenue to the Integrity Fund at very little to no additional cost to USCIS. It would further protect against a flurry of remedial filings after a good faith failure to make the

*Brief in Support of Motion for TRO - 22*

Integrity Payment. The massive harm that termination will cause to NRCC and Montana greatly outweighs the efforts USCIS would have to take to send the same letter in a timely fashion.

As such, USCIS' NOIT violates NRCC's constitutional Due Process rights.

## II.   NRRC will close if it is terminated.

The NRRC will suffer irreparable harm if it is terminated because it will have to close its doors without a designation. First, termination will shut down NRRC. Kidd Dec. ¶¶ 34-43. Where a denial of a license will close a business or put at risk a "substantial portion" of its revenue, the business suffers irreparable harm. *Farid v. United States Dep't of Agric., Food & Nutrition Serv.*, No. EDCV1802021CJCSPX, 2019 WL 13045128, at *3 (C.D. Cal. Jan. 9, 2019). "[B]eing forced into bankruptcy" too constitutes irreparable harm. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011). Termination will deprive the NRRC of the "designation" or license that gives its business any value, and therefore, it will close down NRRC.

Second, the NRRC will suffer irreparable harm to its reputation and good will. "Harm to one's reputation, goodwill, or relationships . . . may constitute irreparable harm." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 976 (C.D. Cal. 2016), aff'd, 869 F.3d 848 (9th Cir. 2017). Here, USCIS will publicly post that NRRC is a "terminated" regional center and it will contact all of its investors to put them on notice of the termination—even if the termination is later reversed. *See*

USCIS, Policy Manual, Vol. 6, Part G, Ch. 8(A)(2) ("If USCIS terminates a regional center, it also notifies affected investors."); https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-regional-centers/regional-center-terminations   (last visited July 16, 2024). Despite its years of success, termination will harm the reputation, current solicitations, and goodwill NRRC has built up since 2011. Kidd Dec. ¶¶ 39-41.

Finally, the downstream effects of the termination—if it is reversed—cannot be remedied with money damages. First, USCIS is immune from money damages for an improper termination. Second, after termination, the investors have only 180 days to protect their pending petitions. So, even if NRRC is successful in this litigation in the normal course, the investors will have to transfer regional centers before a conclusion, which will deprive NRRC of all of its revenue. In other words, the tight timelines the investors must satisfy to protect their investments mean any victory in the long term without an injunction will prove pyrrhic. This is irreparable harm.

## III.   Equities favor an injunction.

The equities favor an injunction. First, NRRC is associated with $1.7 billion dollars in ongoing projects in Montana. Kidd Dec. ¶ 38. Termination will put those development dollars at risk because it will not be easy to replace the EB-5 capital

given today's interest rates. Kidd Dec. ¶ 39. Second, the jobs that have already been created with those projects will be at risk; that puts at risk thousands of full-time jobs in Montana. *Id.* at ¶ 8. Finally, the public is benefited by holding federal agencies accountable for their unlawful actions, such as termination without any actual notice.

USCIS will suffer no harm from this injunction. First, if the Court enjoins the termination, it will not deprive USCIS of any funds or fees. Rather, if NRRC is successful, USCIS will in fact benefit from a payment of the Integrity Fees—even with penalty. Second, enjoining the termination will slow the flood of new applications that NRRC's associated businesses and investors will have to file with USCIS to try to protect themselves from the consequences of the termination. At a minimum, 515 pending applicants will have to file new petitions with USCIS based on new regional centers or investments. These will be added to the significant backlog already in existence for EB-5 benefits, such as a 53.3 month wait for each immigrant investor petition. https://egov.uscis.gov/processing-times/historic-pt (last visited July 16, 2024).

The NRRC has created thousands of jobs in Montana. It has catalyzed billions of dollars in investment in Montana. And it plans to continue its success into the future. Montana benefits from an injunction preventing the consequences of termination until the parties can brief the issue fully and the Court can consider

*Brief in Support of Motion for TRO - 25*

it under the normal time frame. Because NRRC is likely to win, will suffer irreparable harm without an injunction, and the harm will cost Montana money and jobs, an injunction is in the public interest.

## CONCLUSION

For these reasons, this Court should enjoin the NOIT because it is procedurally defective.

Dated this 17th day of July, 2024.

By: */s/Ian McIntosh*
    Ian McIntosh
    Crowley Fleck PLLP

     *and*

    Brad Banias (*Pro Hac Vice filed 07/17/24*)
    Banias Law, LLC
    602 Rutledge Avenue
    Charleston, SC 29403
    brad@baniaslaw.com

    *Attorneys for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, Ian McIntosh, certifies that this brief complies with the requirements of Local Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionally spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count is 6,150 words, excluding caption, certificates of services and compliance, and table of contents and authorities. The undersigned rely on the word count of the word processing system used to prepare this document.

By: */s/ Ian McIntosh*
Ian McIntosh

*Brief in Support of Motion for TRO - 27*