IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| NORTHERN ROCKIES REGIONAL CENTER, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>UR M. JADDOU, DIRECTOR, U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>Defendant. | CV 24–99–M–DWM<br><br><br>OPINION<br>and ORDER |

On June 27, 2024, Plaintiff Northern Rockies Regional Center, LLC

("Northern Rockies") received a "Notice of Intent to Terminate" from the United

States Citizen and Immigration Services (the "Agency") noticing the Agency's

intent to terminate its designation under the Regional Center Program, *see* 8 U.S.C.

§ 1153(b)(5)(E), for failing to pay its 2024 EB-5 Integrity Fund fee by December

30, 2023. (*See* Doc. 6-3.) On July 15, Northern Rockies filed suit, alleging that

the Agency's notice violated the 2022 Reform and Integrity Act, the

Administrative Procedure Act ("APA"), and the Due Process Clause of the United

States Constitution. (Doc. 1.) On July 29, 2024, a motion hearing was held and

the Court granted Northern Rockies' request for preliminary injunctive relief. (*See*

1

Docs. 5, 19.)  Given the imminence of the Agency's action, the July 29, 2024

Order did not contain explanatory reasoning.  That reasoning is provided below.

**BACKGROUND**

As noted by Northern Rockies, all the record evidence was submitted by

Northern Rockies; the Agency did not provide any factual evidence in opposing

the request for preliminary injunctive relief.

## I.   The EB-5 Program

In 1990, Congress established a program that sets aside visas for immigrants

who help create jobs for American workers.  *See* Immigration Act of 1990, Pub. L.

No. 101-649, § 121(a), 104 Stat. 4978, 4987 (1990) (codified at 8 U.S.C.

§ 1153(b)(5)).  These "EB-5 visas" are available to applicants who make a

substantial capital investment in a commercial enterprise (ranging from $500,000

to $1,800,000, depending on the date and target of the investment) that will

directly create at least ten full-time jobs in the United States.  *See* 8 U.S.C.

§ 1153(b)(5)(A).  Two years later, Congress created the "Regional Center

Program," an alternative path to an EB-5 visa.  *See* 1993 Appropriations Act, Pub.

L. No. 102-395, § 610, 106 Stat. 1828, 1874 (1992) (codified at 8 U.S.C.

§ 1153(b)(5)).  Under the Regional Center Program, immigrant investors may

"satisfy the EB-5 employment-creation requirement by creating jobs indirectly"

through a minimum investment into a designated "regional center."  *Bromfman v.*

2

*USCIS*, 2021 WL 5014436, at *2 (D.D.C. Oct. 28, 2021).  A "regional center" is an "economic unit, public or private, which is involved with the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment."  8 C.F.R. § 204.6(e).  To become a designated "regional center" for EB-5 purposes, a proposed center must submit a petition with proof that it will, among other things, have a positive impact on the local and national economy.  *Id.* § 204.6(m).

In 2022, Congress passed the EB-5 Reform and Integrity Act, which introduced a host of reforms to the EB-5 visa processes, including the creation of the EB-5 Integrity Fund (the "Integrity Fund" or the "Fund") to pay for the enforcement of the Act's new accountability and integrity measures.  *See* Pub. L. 117-103, § 103, 136 Stat. 1070, 1075 (2022) (codified at 8 U.S.C. § 1153(b)(5)(J)).  Under this new provision, regional centers are required to pay an annual fee of either $10,000 or $20,000, depending on the number of involved investors, by October 1 of each year.  *See* 8 U.S.C. § 1153(b)(5)(J)(ii)(I).  If a regional center fails to pay the fee within 30 days after it is due, "[t]he Secretary of Homeland security shall . . . impose a reasonable penalty."  *Id.* § 1153(b)(5)(J)(iv)(I).  But if a regional center fails to pay the fee within 90 days of its due date, the Secretary "shall . . . terminate the designation."  *Id.* § 1153(b)(5)(J)(iv)(II).  Because the new fee did not go into effect until March 2023, the payments for fiscal year 2023 were

3

due April 1, 2023, with all future payments due between October 1 and October 31 every year going forward. *See* 88 Fed. Reg. 13141, 13141 (Mar. 2, 2023). Thus, the payment for fiscal year 2024 was due by October 30, 2023.[1] *See id.* In 2023, the Agency had not yet decided what a "reasonable" penalty would be for a late fee, so did not charge a late fee for delinquent fiscal year 2023 payments. *See id.* at 13143. However, the Agency warned that it would,

> as authorized by the 2022 Act, terminate the designation of any regional center that does not pay the full fee within 90 days after the date on which such fee is due (i.e., a regional center does not make payment, or a regional center pays $10,000 when it owes $20,000). Termination will not be automatic and [the Agency] will provide a notice of intent to terminate and the opportunity for the regional center to prove that the fee was paid in the proper amount by the due date before sending a notice of termination.

*Id.* Essentially, while the Agency would allow a regional center to prove that it had paid the fee before the deadline, it would not allow a regional center to cure by making a payment after that deadline. In essence, the Agency's guidance results in automatic termination, despite its assurance to the contrary.

---

[1] Apparently, the Agency also "published an Alert on its website announcing that the fiscal year 2024 Integrity Fund Fee would be due on or by October 1, 2023, and that the agency would begin terminating any regional center that d[id] not pay the fee on or by December 31, 2023." *EB5 Holdings, Inc. v. Jaddou*, ___ F. Supp. 3d ___, 2024 WL 687945, at *3 (D.D.C. Feb. 20, 2024) (internal quotation marks and alteration omitted). This notice provision was not proffered by the Agency and is not relied on here.

## II.   Northern Rockies Regional Center, LLC

Northern Rockies was organized under the laws of Montana in May 2010 and "designated" a regional center under the EB-5 program on April 11, 2011. (Doc. 6-1 at ¶¶ 4, 6.) "Over the next 13 years, it raised more than $488 million dollars [sic] for foreign investors for projects exclusively in Montana," creating more than 7,500 jobs. (*Id.* ¶ 8.) Since receiving its designation, Northern Rockies has completed two major projects and is currently seeking investment in three major projects. (*See* Doc. 6 at 8–9.) These projects have all been focused on luxury housing, retail space, restaurants, and amenities in and around Big Sky, Montana. (*See id.*)

On March 27, 2023, Northern Rockies timely paid its 2023 Integrity Fund fee of $20,000. (Doc. 6-1 at ¶ 12); *see* "Notice of EB-5 Regional Center Integrity Fund Fee," 88 Fed. Reg. 13141 (Mar. 2, 2023). Shortly thereafter, Northern Rockies entered negotiations to be purchased by its current owner, Matthew Kidd. (*See id.* ¶ 13.) A regional center must file a request to amend its designation before a significant change to its structure, ownership, or administration. 8 U.S.C. § 1153(b)(5)(E)(vi)(I). Accordingly, Northern Rockies filed a Form I-956 application on June 16, 2023, seeking agency approval of its change in ownership. (Doc. 6-1 at ¶ 15.) On October 16, 2023, that transaction closed consistent with the Form I-956, and the seller represented that Northern Rockies had no

5

indebtedness or liabilities.  (*Id.* ¶¶ 17–18.)  Northern Rockies therefore continued

to solicit investors for ongoing projects.  (*Id.* ¶ 19.)  On May 3, 2024, the Agency

approved the Form I-956, authorizing the change in ownership.  (*Id.* ¶¶ 20–22; *see*

Doc. 6-2.)  That approval made no reference to any outstanding obligations or

administrative deficiencies but did inform Northern Rockies that it would need to

pay the Integrity Fund fee for fiscal year 2025 by October 1, 2024.  (*See id.*)

Nevertheless, during this acquisition timeframe, Northern Rockies *did not*

*pay its 2024 Integrity Fund fee*, which was due by October 1, 2023.  Consequently,

on June 27, 2024, the Agency issued a Notice of Intent to Terminate Northern

Rockies' designation under the EB-5 program (the "Notice").  (*See* Doc. 6-3.)  The

Notice states:

> The Regional Center must provide evidence that it submitted the
> required EB-5 Integrity Fund fee payment within the applicable
> payment period.  [The Agency] will reject EB-5 Integrity Fund fee
> payments for fiscal year 2023 and/or fiscal year 2024 received after
> Dec. 30, 3023, including those made in response to this Notice of Intent
> to Terminate.

(*Id.* at 1.)  The Notice includes a response deadline of July 30, 2024, and states that

the "[f]ailure to respond to th[e] notice of intent to terminate will result in

termination of the regional center designation."  (*Id.* at 1, 3.)

## III.  The Present Case

On July 15, 2024, Northern Rockies sued the Director of the United States

Citizenship and Immigration Services, alleging that the Notice violates Northern

6

Rockies' regulatory and statutory process rights under the 2022 Integrity and Reform Act and the APA, as well as Northern Rockies' due process rights under the Fifth Amendment to the United States Constitution. (Doc. 1.) On July 17, Northern Rockies filed a motion seeking a temporary restraining order and/or a preliminary injunction. (Doc. 5.) The request for a temporary restraining order was denied for failing to include the necessary certifications under the federal rules. (*See* Doc. 7 at 2 (quoting Fed. R. Civ. P. 65(b)(1)(B)).) A preliminary injunction hearing was held on July 29, 2024, (*see* Doc. 18 (Min. Entry)), and Northern Rockies' request for preliminary injunctive relief was granted, (*see* Doc. 19).

## ANALYSIS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To succeed on its request, Northern Rockies must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. The Ninth Circuit applies a sliding scale test to these factors: if Northern Rockies can at least raise "serious questions going to the merits" and demonstrate a "balance of hardships that tips sharply towards [it]," Northern Rockies is entitled to preliminary injunctive relief "so long

7

as . . . [it] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "Serious questions are issues that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) (internal quotation marks omitted). Thus, parties do not show serious questions when they raise a "merely plausible claim," nor can a district court "forgo legal analysis just because it has not identified precedent that places the question beyond debate." *Id.* (internal quotation marks omitted).

Independently, the APA authorizes the reviewing court, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury . . . [to] issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

Ultimately, because Northern Rockies has raised serious questions going to the merits of its APA claim, and has shown that it will suffer irreparable harm and the balance of equities tips sharply in its favor, preliminary injunctive relief is warranted here.

## I.     Likelihood of Success on the Merits

"The first factor under *Winter* is the most important—likely success on the

merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Northern

Rockies argues that it is likely to succeed on the merits because the Notice violates

its procedural rights under the 2022 Reform and Integrity Act, the APA, and the

Constitution. In response, the Agency argues that Northern Rockies failed to

exhaust its administrative remedies and that neither the cited statutes nor the

Constitution mandate the type of notice Northern Rockies alleges was required

here. Because Northern Rockies has raised serious questions about pre-termination

notice under the APA, it has met its burden here.

### A.     Exhaustion of Administrative Remedies

As a threshold matter, the Agency half-heartedly argues that Northern

Rockies cannot seek judicial review until it has exhausted its administrative

remedies. Indeed, the statute provides that "no court shall have jurisdiction to

review a determination under [8 U.S.C. § 1153(b)(5)] until the regional center, its

associated entities, or the [foreign national] investor has exhausted all

administrative appeals." 8 U.S.C. § 1153(b)(5)(P)(ii). That review includes of any

"determination" involving "the termination or suspension of any benefit accorded

under [§ 1153(b)(5)]." *Id.* § 1153(b)(5)(P)(i)(IV). Northern Rockies argues that

exhaustion would be futile because it is undisputed that it did not pay the fee by the

deadline and the Agency has taken the position that it lacks any discretion to allow a late payment. *See Carr v. Saul*, 593 U.S. 83, 93 (2021) (recognizing a futility exception to exhaustion requirements). This argument is persuasive insofar as an administrative appeal could not provide the requested relief. Accordingly, the failure to exhaust does not bar Northern Rockies' claims.

### B.   2022 Reform and Integrity Act

Northern Rockies argues that the Agency violated the 2022 Reform and Integrity Act because the Act mandates two steps be taken when a regional center fails to pay its Integrity Fund fee on time, and the Agency skipped the first step. Indeed, the first subsection of § 1153(b)(5)(J)(iv) states that the Agency "shall" impose a reasonable penalty for payments missed after the first 30 days. *See* 8 U.S.C. § 1153(b)(5)(J)(iv)(I). The second subsection of § 1153(b)(5)(J)(iv) then states that the Agency "shall" terminate the designation for payments missed after 90 days. *Id.* § 1153(b)(5)(J)(iv)(II). Therefore, according to Northern Rockies, the Act "mandate[s] that [the Agency] give notice of a late-penalty before terminating." (Doc. 6 at 18.) It is undisputed that the Agency did not impose any penalties for Northern Rockies' missed 2024 payment, nor did it provide any notice to that effect. However, the Agency persuasively argues that Northern Rockies' characterization of the late-fee penalty as a "notice" is incorrect.

10

At base, Northern Rockies' argument is that if it had been assessed a late penalty for failing to pay within the 90-day window, it would have alerted the company to the fact that the payment was missed and it would have paid before the 90-day deadline. However, as argued by the Agency, even if it was required to assess a late-fee for a regional center missing the 30-day deadline, the statute does not require that that penalty be assessed between October 30 and December 30 of each year. There is no reason under the statutory language that that penalty could not be assessed after the fact. Thus, even if the plain statutory language is read to mandate the imposition of a penalty, there is no guarantee of the type of "notice" Northern Rockies seeks. Moreover, contrary to Northern Rockies' contention, assessing a penalty after the 90-day deadline does not make the penalty illusory. For example, if a regional center paid on November 15, that regional center would not be terminated but would owe a penalty because it paid after the 30-day deadline but before the 90-day deadline. Fundamentally, the statute mandates a "penalty," not "notice" of a non-payment. Thus, Northern Rockies' arguments that the 2022 Reform and Integrity Act mandates a "two-step process" and that it was denied "notice" per the terms of that process lack merit.

That said, Northern Rockies persuasively argues that the Agency's position regarding its discretion is internally inconsistent. The Agency determined that is had the discretion to both change the deadline for the 2023 payment and to not

11

assess late fees for that payment.  *See* 88 Fed. Reg. 13143.  It now argues,

however, that it has no choice but to terminate a regional center that fails to pay by

the 90-day deadline.  (*See* Doc. 14 at 16.)  Although Northern Rockies is unlikely

to prevail on its "notice" claim as discussed above, the Agency's arbitrary exercise

of discretion reinforces the conclusion that the equities favor Northern Rockies.

*See Dep't of Homeland Sec. v. Regents of U. of Cal.*, 591 U.S. 1, 24 (2020)

("[While m]en must turn square corners when they deal with the Government[,] . .

. the Government should turn square corners in dealing with the people." (internal

quotation marks and citation omitted)).

## C.    APA

The APA provides certain procedural safeguards for entities that have been

granted licenses by federal agencies.  *See* 5 U.S.C. § 558.  Specifically,

> Except in cases of willfulness or those in which public health, interest,
> or safety requires otherwise, the withdrawal, suspension, revocation, or
> annulment of a license is lawful only if, before the institution of agency
> proceedings therefor, the licensee has been given
>
> (1) notice by the agency in writing of the facts or conduct which may
> warrant the action; and
>
> (2) opportunity to demonstrate or achieve compliance with all lawful
> requirements.

*Id.* § 558(c).  Under the APA, a "license" "includes the whole or a part of an

agency permit, certificate, approval, registration, charter, membership, statutory

exemption or other form of permission."  *Id.* § 551(8).  Additionally, the APA

12

provides that a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so expressly." *Id.* § 559.

The parties first dispute whether Northern Rockies' regional center designation is a "license" under the APA. Northern Rockies argues that it is because "[t]he definition of license in the APA is extremely broad." *Air N. Am. v. Dep't of Transp.*, 937 F.2d 1427, 1436–38 (9th Cir. 1991). The Agency argues that it is not because the APA does not cover statutory and regulatory law governing immigration programs. Northern Rockies' position is more persuasive.

The Second Circuit, for example, has held that the designation of a medical facility as a selected "civil surgeon" approved to perform medical evaluations for aliens seeking permanent resident status was a "license" within the meaning of § 558. *See N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 82 (2d Cir. 1975). Considering *New York Pathological*, the Ninth Circuit has clarified "that agency approval can constitute a license within the meaning of the APA even if the lack of approval does not prohibit the purported licensee from engaging in any private activity." *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 962 (9th Cir. 2011) (indicating that the Park Service's decision to revoke a vendor's conditional approval of its bear-proof container was akin to a "license" under the APA as it "had a substantial impact on the market for [the vendor's] products"). The fact that Northern Rockies can continue to invest in development

projects without a regional center designation does not diminish the fact that it can only engage in the activities prescribed by 8 U.S.C. § 1153(b)(5) because of that designation. The designation of a regional center is therefore a "license" within the meaning of § 558. *See also Blackwell Coll. of Bus. v. Att'y Gen.*, 454 F.2d 928, 933–34 (D.C. Cir. 1971) (an agency's revocation of status as an approved school for attendance by nonimmigrant alien students was revocation of an APA license).

The next question then is whether the Agency complied with § 558(c). Contrary to the Agency's argument, it was required to give Northern Rockies both "adequate notice and adequate opportunity to correct its shortcomings." *Air N. Am.*, 937 F.2d at 1437. As argued by Northern Rockies, the Ninth Circuit has "noted that the purpose of section 558(c) is to provide individuals with an opportunity to correct their transgressions before the termination or suspension of their licenses[,]" i.e., a "second chance." *Id.* at 1438. Northern Rockies has therefore raised a serious question whether the "notice" provided in this instance complied with the APA.

The limited record here shows that Northern Rockies arguably received two "notices" of the Integrity Fund fee deadline. First, Northern Rockies—like all designated regional centers—was given notice of the Integrity Fund fee deadlines when the Agency issued its interpretive guidance in March 2023. *See* 88 Fed. Reg. at 13143. While the Ninth Circuit has held that notice given "at the time that the

14

rule became effective" may be sufficient under the APA, it recognized that such notice "will not in all cases be sufficient; a claim of unfair surprise may carry significant weight if no notice of a rule's requirements has been given for many years." *Air N. Am.*, 937 F.2d at 1437–38. Here, the situation is the inverse: the rule and interpretive guidance were brand new and unfamiliar. Moreover, the Agency had *not* strictly enforced the fee deadlines for the only year they had yet been due. And the guidance was provided in the form of an interpretive rule that was not subject to the usual notice and comment period, and therefore considered not binding. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). It is not clear that a single, nonbinding publication in the Federal Register nine months before the fee was due was sufficient to "prevent[] unfair surprise." *Air N. Am.*, 937 F.2d at 1438.

More importantly, however, Northern Rockies was not given an opportunity to pay the fee prior to being given notice of its termination. Indeed, while the Agency's second attempt at notice through the issuance of the Notice of Intent to Terminate was indubitably sufficient to inform Northern Rockies of its noncompliance, it provided no "opportunity to comply with the relevant rules." *Id.* The Agency argues that the APA requires only an opportunity to comply *or* "an opportunity to demonstrate compliance." *Id.* That is indeed the language used by the Ninth Circuit. However, in its next breath, the Ninth Circuit explained that

15

notice was adequate there because the plaintiff received notice sufficiently prior to the deadline "to bring itself into compliance with [the rule]." *Id.* As argued by Northern Rockies, the Ninth Circuit has specifically stated that "[t]he purpose of the APA 'second chance' doctrine is to give wrongdoers an opportunity to correct their transgressions before actual termination or suspension of their licenses." *Lawrence v. Commodity Futures Trading Comm'n*, 759 F.2d 767, 773 (9th Cir. 1985) (internal citation omitted). Contrary to Northern Rockies' argument, however, this does not necessarily mean that the Agency must give such notice prior to the 90-day timeframe for termination; rather, "[a] plain reading of the statute demonstrates . . . that the opportunity to comply must be given before the actual suspension or cancellation of the license." *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 2009 WL 10691087, at *8 (D. Nev. Mar. 12, 2009). Regardless, however, there is no question that neither opportunity for compliance was provided here.

Accordingly, Northern Rockies has raised serious questions as to whether the notice provided by the Agency complied with § 558(c) of the APA.

### D.    Due Process

Finally, Northern Rockies argues that the Notice violated its rights under the Fifth Amendment Due Process Clause because it deprives the company of a meaningful opportunity to respond. In determining whether the procedures

16

provided by the government are constitutionally sufficient, courts generally apply

the three-part inquiry set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976).

Consistently,

> [f]irst, courts must look at the nature of the interest that will be affected
> by the official action, and in particular, to the 'degree of potential
> deprivation that may be created.' Second, courts must consider the
> 'fairness and reliability' of the existing procedures and the 'probable
> value, if any, of additional procedural safeguards.' Finally, courts must
> assess the public interest, which 'includes the administrative burden
> and other societal costs that would be associated with' additional or
> substitute procedures.

*Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015) (quoting

*Mathews*, 424 U.S. at 341, 343, 347). Here, notice was adequate under the

Constitution.

### 1.    Private Interests at Stake

The private interest at stake here is the ability to operate under the EB-5

program. While the Agency is correct that Northern Rockies could continue to

operate as an LLC in the absence of its regional center designation, Northern

Rockies has demonstrated that its EB-5 status is existential. Moreover, while

Northern Rockies could immediately seek to be re-designated, that process would

prevent it from continuing to operate in the immediate future on current projects

with current funding. Additionally, re-designation would take an unknown amount

of time and cost approximately $6.5 million in fees. (*See* Doc. 17 at ¶¶ 7–10.) It

would also place 20,000 jobs "in serious jeopardy." (*Id.* ¶ 11.) At this point, these

facts are uncontroverted.  Thus, while not technically permanent, termination would be expensive and disruptive for Northern Rockies.  *See Mackey v. Montrym*, 443 U.S. 1, 12 (1979) ("The duration of any potentially wrongful deprivation of a property interest is an important factor in assessing the impact of official action on the private interest involved.").  On balance then, the private interest here is arguably "substantial."  *See Nozzi*, 806 F.3d at 1193 (holding that loss of Section 8 subsidies is "substantial" as they may be the "difference between safe, decent housing and being homeless").

### 2.    Risk of Erroneous Deprivation

Under the second prong of the due process inquiry, the question is "whether the procedures provided to the [Northern Rockies] risked erroneous deprivation of [its] right to [its existing EB-5 designation], as well as the value of any additional safeguards." *Nozzi*, 806 F.3d at 1193.  To pass constitutional muster, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties . . . with due regard for the practicalities and peculiarities of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  "[W]hen notice is a person's due, process . . . must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.  The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground

that it is in itself reasonably certain to inform those affected." *Id.* at 315.  Under this standard, notice was sufficient.

As discussed above, the Agency published a notice in the Federal Register indicating the Integrity Fund fees due dates for 2023 and 2024 and what the potential penalty would be for noncompliance.  *See* 88 Fed. Reg. at 13143; *see Nozzi*, 806 F.3d at 1194 (explaining that adequate notice should "reasonably inform its intended recipients of the changes . . . [at issue], the meaning of those changes, or, most important, their effect upon the recipient").  While individual notice was not provided to the designated regional centers, the Supreme Court has held that "notice published in the Federal Register, as well as that afforded by the Secretary in full compliance with his own procedures, was more than ample to satisfy any due process concerns." *Lyng v. Payne*, 476 U.S. 926, 942–43 (1986); *see also* 44 U.S.C. § 1507 (stating that publication in the Federal Register "is sufficient to give notice of the contents of the document to a person subject to or affected by it").

Moreover, despite the recency of the Integrity Act, Northern Rockies was aware that it had to pay the Integrity Fund fee, as demonstrated through its payment for fiscal year 2023. (*See* Doc. 6-1 at ¶ 12.)  As argued by Northern Rockies itself, it had held a regional center designation for over ten years and was consistently compliant with all regulatory requirements. (*See id.* at ¶ 10.)  This is

19

not a situation involving an unsophisticated entity. *See Intel Corp. v. U.S.*

*Citizenship & Imm. Servs.*, ___ F. Supp. 3d ___, 2024 WL 3354965, at *7 (N.D.

Cal. July 10, 2014). (considering the fact that "the parties receiving such notices

were relatively sophisticated" in rejecting due process challenge).

Ultimately, constitutional due process requires neither individualized notice

nor an opportunity to cure prior to the termination of a regional center's

designation.  It is in this latter capacity that the due process analysis diverges from

that under the APA.  As discussed above, in this Circuit, the APA has been

interpreted to require that a license-holder be given an opportunity to cure prior to

termination of its license.  The Due Process Clause does not require the same

opportunity.

### 3.   Burden of Providing the Requested Procedure

Northern Rockies argues that the Agency should have provided individual

notice of the company's failure to pay the fee on time between the 30-day deadline

and the 90-day deadline.  As argued by the Agency, requiring it to inform all

delinquent regional centers within the same 60-day period would have imposed a

substantial burden on the Agency and its administration of the Integrity Fund fee.

Given that the procedures employed by the Agency were reasonably calculated to

inform regional centers of their payment obligations, this additional burden weighs

against finding a violation of Northern Rockies' due process rights.

20

Based on the foregoing, Northern Rockies' due process claim fails as a matter of law. Although the Agency could have provided individualized notice and an opportunity to cure, due process did not require it do either. *See Intel*, 2024 WL 3354965, at *8 (explaining that an agency need not, consistent with constitutional due process, "implement procedures that would eliminate every possibility of . . . error").

### E.    Conclusion

Northern Rockies has raised serious questions going to the merits of its APA claim in light of the Ninth Circuit's interpretation of what § 558(c) requires. While due process also presents a close question, the Constitution does not require individualized notice or the same opportunity to cure. Thus, that claim—like Northern Rockies' claim under the 2022 Reform and Integrity Act—fails as a matter of law.

## III.    Irreparable Harm

In order to obtain a preliminary injunction, a plaintiff must allege more than the possibility of harm. *Winter*, 555 U.S. at 22. A plaintiff must demonstrate that absent such an order, irreparable harm is likely. *Id.* Northern Rockies has done so here. The Agency argues that Northern Rockies has shown, at best, monetary loss, which would not qualify as irreparable harm. Not so. As argued by Northern Rockies, "[w]ithout its designation, it cannot participate in the EB-5 program; its

current investors cannot get their lawful permanent residency; and it cannot pursue new investors for its ongoing or future projects." (Doc. 6-1 at 3.) More specifically, "[t]he termination will put at risk the processing of approximately 515 pending immigrant visa petitions for noncitizens who invested between $500,000 and $800,000 each in projects in Montana," (*id.* ¶ 36), and "[t]he denial of these applications is an existential risk . . . because . . . these investors could demand return of their capital or associate with a new regional center," (*id.* ¶ 37). Additionally, termination of the designation could stop existing projects and prevent such projects from going forward in the future due to potential changes the market. (*Id.* ¶¶ 38–39.) This would impact Montana jobs.

In response, the Agency argues that investors are protected by the statute in a case, such as this, where a regional center is terminated for noncompliance with the program. *See* 8 U.S.C. § 1153(b)(5)(M). The Agency also argues that Northern Rockies can continue to operate as an LLC and simply apply for a new designation, as it is not foreclosed from doing so under the EB-5 program. However, neither of these facts undermine the immediate harm to Northern Rockies itself. The fact that its investors maybe be able to salvage their attempt at legal residency and that the company may eventually regain its footing are not sufficient to counterbalance the existential harm identified above. Northern Rockies has shown irreparable harm.

Notably, the Agency has presented no factual evidence in response to
Northern Rockies' motion. While the Agency carries no burden, it nonetheless
speculated that Northern Rockies' investors could simply reinvest in other regional
centers and that those regional centers were "likely" to be in Montana. As argued
by Northern Rockies, there is no evidence to support this assertion. Nor is there
any evidence to support the Agency's statement that if Northern Rockies was
forced to seek re-designation, the process would be "expedited" or "streamlined."

## IV.    Balance of Equities and Public Interest

Finally, under the "balance of the equities" analysis, a court must "balance
the competing claims of injury" and "consider the effect on each party of the
granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal
quotation marks omitted). The public interest inquiry, by contrast, "primarily
addresses impact on non-parties rather than parties." *League of Wilderness
Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th
Cir. 2014). When the government is a party, the analyses on the final two elements
merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).
Here, these final considerations are likely neutral. As discussed above, the injury
to Northern Rockies in this instance is serious and likely irreparable. Despite its
years of regulatory compliance and its investments in Montana projects, it may
never recover from failing to pay a $20,000 fee.

23

Moreover, as discussed at the hearing, there is no statutory mandate as to when termination must occur once the Agency decides to proceed under § 1153(b)(5)(J)(iv)(II). Thus, delaying that process to allow for judicial review of the Agency's actions does not contravene Congressional intent or interfere with the Agency's mandate. To the contrary, because the 2022 Reform and Integrity Act just recently went into effect, it is in the public interest to determine whether it is being properly administered. To wit, if Northern Rockies were permitted to pay the Integrity Fund fee, those funds would go toward their stated purpose: oversight of the EB-5 program. If Northern Rockies is forced to re-designate instead, however, it appears those funds would go into different coffers and not support the congressional intent of enforcing the 2022 Reform and Integrity Act.

Finally, the Agency's actions as it relates to both the fee and Northern Rockies' noncompliance suggest arbitrary and capricious enforcement. As discussed above, the Agency takes an inconsistent position as to whether it has discretion to alter the sanctions imposed under the 2022 Reform and Integrity Act. Additionally, as it relates to Northern Rockies specifically, in May 2024, the Agency approved the transfer of ownership, indicating that Northern Rockies was compliant with its statutory obligations. (*See* Doc. 6-2.) That approval in fact reminded Northern Rockies of its obligation to pay is *2025 fee* by October 2024. (*See id.*) The Agency then sent a Notice of Termination 45 days later, suggesting

24

that the Agency itself has internal inconsistencies regarding its administration of the regional center program.  That conduct must be balanced against the fact that Northern Rockies has repeatedly stated that if given the opportunity, it would pay the $20,000 fee today, including any sort of penalty.  Thus, this is not a case where the movant seeks to avoid a regulatory burden; to the contrary, Northern Rockies would gladly pay.

Ultimately, as stated by Northern Rockies at the preliminary injunction hearing, if the assessment is one of equity, there is no question that functionally terminating a million-dollar business that employs thousands of Montanans for the one time-failure to pay a $20,000 fee is not equitable.

## V.    **Bond**

Pursuant to Rule 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Here, given that the fee at issue is $20,000, a bond in that amount is appropriate.

CONCLUSION

Based on the foregoing, IT IS ORDERED that Northern Rockies' request for preliminary injunctive relief is GRANTED as previously Ordered.  (*See* Doc. 19.)

25

IT IS FURTHER ORDERED that Northern Rockies must pay a bond of $20,000, to be deposited with the Court no later than August 8, 2024.

DATED this _31st_ day of July, 2024.

14:36 P.M.

Donald W. Molloy, District Judge
United States District Court